# EXHIBIT A

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | |
|---|---|
| **CARDINAL HEALTH, INC.**<br>7000 Cardinal Place<br>Dublin, Ohio 43017<br><br>          Plaintiff,<br><br>      vs.<br><br>**NATIONAL UNION FIRE INSURANCE**<br>**COMPANY OF PITTSBURGH, PA**<br>70 Pine St.<br>New York, NY 10270<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. _____

**COMPLAINT FOR DECLARATORY JUDGMENT**

**H – OTHER CIVIL**

**JURY DEMAND ENDORSED HEREON**

## PLAINTIFF'S COMPLAINT
## FOR DECLARATORY JUDGMENT

Plaintiff Cardinal Health, Inc., on its own behalf and on behalf of its insured subsidiaries

or affiliates that have been named in the underlying Opioid Claims (as that term is defined

herein), including but not limited to Cardinal Health 110, LLC (collectively "Cardinal Health"),

for its complaint against defendant National Union Fire Insurance Company of Pittsburgh, PA,

("Defendant"), states as follows:

### NATURE OF THE ACTION

1.     This insurance coverage action concerns Defendant's obligations under certain

commercial general liability insurance policies described below that cover "occurrences"

resulting in bodily injury between June 30, 1999 and June 30, 2004 (the "Policies"). Cardinal

Health has sought coverage under the Policies for claims and suits brought against Cardinal

Health by governmental entities, Native American tribes, individuals, hospitals, and health and

welfare plans, among others, arising from what is described as the "opioid epidemic"

(collectively, the "Opioid Plaintiffs"). The Opioid Plaintiffs allege that they suffered

compensatory and other loss and damages due to bodily injury, including the death, addiction, or other dependence or bodily injury of individuals, allegedly caused or contributed to by Cardinal Health's distribution of prescription opioid medications (the "Opioid Claims").

2.      Cardinal Health has incurred millions of dollars of defense costs while defending the Opioid Claims, and it has been sued in multiple state and federal jurisdictions.  Cardinal Health has incurred a substantial portion of its defense costs to date in connection with the multi-district coordinated proceeding captioned *National Prescription Opiate Litigation*, Case No. 1:17-MD-2804 (N.D. Ohio) (the "MDL"), including the claims by Cuyahoga and Summit Counties, Ohio (the Cuyahoga and Summit County claims were known as the "Track 1A cases"). Given the large number of Opioid Claims, this action seeks a declaration with respect to certain exemplar lawsuits, as identified below (the "Exemplar Lawsuits") and the MDL.  Cardinal Health has adopted this approach in order to conserve the parties' and the Court's resources and to foster a swift and efficient resolution of the parties' disputes, without prejudice to Cardinal Health's right to seek declarations and/or judgments as to any specific opioid lawsuit and any specific insurance policy as to which a dispute arises.

3.      Cardinal Health seeks a declaration that Defendant must defend Cardinal Health or pay its defense costs, on both a retrospective and a prospective basis in the Exemplar Lawsuits, including Cardinal Health's defense costs incurred in the MDL.  As shown below, the Opioid Claims are at least potentially covered by the Policies and therefore Defendant must defend Cardinal Health in each of the Exemplar Lawsuits, including the MDL.

4.      Cardinal Health further seeks a declaration that it can satisfy the applicable retention of any triggered National Union policy of its choosing, and that upon doing so, National Union has a duty to defend (or pay for the defense of) the Opioid Claims until the limits

of liability of the National Union Policy selected by Cardinal Health have been exhausted by indemnity payments.

5.      In addition, Cardinal Health seeks declarations establishing certain disputed terms of the National Union Policies, which affect the rights and obligations of Cardinal Health and Defendant.

6.      Finally, Cardinal Health seeks judicial determinations regarding its right to select the policy or policies that will respond to the Opioid Claims, and that it is not required to prorate defense costs among multiple policy years.

7.      Pending a determination on Cardinal Health's claims for declaratory relief, which will clarify and resolve certain disputes between the parties, Cardinal Health does not seek relief in the way of amounts it has or will incur for any settlements or judgments respecting the Opioid Claims, but reserves such claims for assertion at the appropriate time.

**<u>PARTIES</u>**

8.      Plaintiff Cardinal Health, Inc. is a publicly traded Ohio corporation headquartered in Franklin County, Ohio.  Cardinal Health, Inc. does not itself distribute, dispense, or sell opioids or other prescription medications.  Cardinal Health 110, LLC is a wholly owned subsidiary of Plaintiff Cardinal Health, Inc. and an insured under the policies issued by the Defendant.  Cardinal Health 110, LLC distributes pharmaceutical products to licensed and registered pharmacies.  Cardinal Health 110, LLC is a wholesale distributor of prescription medications, including opioids.

9.      Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is a corporation with a place of business in New York.  National Union issued commercial umbrella liability policies to Cardinal Health in Ohio, as described below.  Upon

information and belief, National Union is licensed to do business and does business as an insurer in Ohio.

## JURISDICTION AND VENUE

10.     At all relevant times, Defendant has regularly transacted business in Ohio and/or is licensed to do business in Ohio.  The Policies were contracted for, issued, and delivered to Cardinal Health in Ohio.  Accordingly, this Court has jurisdiction over Defendant because it regularly transacts business in Ohio, R.C. 2307.382(A)(1), and it contracted to insure risks of Cardinal Health in Ohio, R.C. 2307.382(A)(9).

11.     Cardinal Health seeks a declaration that the claims asserted against it in the Exemplar Lawsuits are within the defense obligation of the Defendant's policies.  Accordingly, this Court has jurisdiction over this action under R.C. 2721.03, et seq., which provides this Court with exclusive jurisdiction over declaratory judgment proceedings.

12.     Venue is proper in Franklin County because all or part of the claim for relief arose in this County.

## THE OPIOID LAWSUITS AND THE EXEMPLAR LAWSUITS

13.     The Opioid Claims pending against Cardinal Health are broadly distributed geographically and are proceeding according to various court schedules and procedures.  At present, there are more than 3,200 separate cases filed in 51 state or federal jurisdictions.  For those lawsuits pending in federal court, almost all of the cases have been consolidated for pretrial purposes in the MDL.  In addition, there are numerous state court cases pending, some of which are consolidated on a statewide basis, including cases filed in the state courts of Alaska, Illinois, New York, Pennsylvania, Texas, and West Virginia.  Hundreds of individual claims are the

subject of lawsuits, including 112 class actions.[1]  More than 200 entities such as hospitals, unions, and other third party payors have filed suit, and those cases include more than 25 class actions.

14.     In general, the Opioid Claims allege that Cardinal Health failed to appropriately report or detect orders of opioids that the underlying plaintiffs consider to have been suspicious or excessive, failed to take appropriate steps to stop such orders from being fulfilled, and failed to oppose the allegedly improper conduct of other underlying defendants in the Opioid Claims, or were in some way complicit with such underlying defendants.

### The Exemplar Lawsuits

15.     For efficiency, Cardinal Health seeks a declaration as to its rights, and Defendant's obligations, regarding the Opioid Claims described more fully below.  Collectively, these are called the "Exemplar Lawsuits" and are as follows:

a.     *The County of Cuyahoga v. Purdue Pharma, L.P., et al.*, No. 17-OP-45004 (the "Cuyahoga County lawsuit");

b.     *The County of Summit, et al. v. Purdue Pharma, L.P., et al.*, No. 18-op-45090 (the "Summit County lawsuit");

c.     *The State of Ohio ex rel. DeWine v. McKesson Corporation, et al.*, CV H20180055 (the "Ohio AG lawsuit");

d.     *The People of the State of New York v. Purdue Pharma, L.P., et al.*, No. 400016/2018 (the "New York AG lawsuit");

e.     *The County of Suffolk v. Purdue Pharma, L.P., et al.*, No. 400001/2017 (the "Suffolk County lawsuit");

---

[1] It is difficult to provide a precise number of individual claims because some lawsuits are individually filed, and others are apparent collective actions.

f.   *The County of Nassau v. Purdue Pharma, L.P., et al.*, No. 400008/2017 (the "Nassau County lawsuit");

g.   *Mayor & City Council of Baltimore v. Purdue Pharma, L.P., et al.*, No. 24 C 18000515 (the "Baltimore City lawsuit");

h.   *The City of Huntington v. AmerisourceBergen Drug Corp., et al.*, No. 3:17-01362 (the "City of Huntington lawsuit");

i.   *Cabell County Commission v. AmerisourceBergen Drug Corp., et al.*, No. 3:17-01665 (the "Cabell County lawsuit");

j.   *The Cherokee Nation v. McKesson Corporation, et al.*, No. 6:18-cv-00056-RAW (the "Cherokee Nation lawsuit");

k.   *Rees v. McKesson Corporation, et al.*, No. 18-511 (the "Rees lawsuit");

l.   *Tucson Medical Center v. Purdue Pharma, L.P., et al.*, No. 4:18-cv-00481-RCC (the "Tucson Medical Center lawsuit");

m.   *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al.*, No. 1:17-MD-2804 (the "West Boca lawsuit");

n.   *Baptist Hospital, Inc., et al. v. McKesson Corporation, et al.*, No. 3:17-cv-816 (the "Baptist Hospital lawsuit");

o.   *Drew Memorial Hospital, Inc. v. Purdue Pharma, L.P., et al.*, No. CV-2017-221-3 (the "Drew Memorial Hospital lawsuit");

p.   *Cleveland Bakers and Teamsters Health and Welfare Fund v. Purdue Pharma, L.P., et al.*, No. 1:18-op-45432-DAP (the "Cleveland Bakers and Teamsters lawsuit");

q.     *United Food and Commercial Workers Union UFCW Local 1529 and Employers Health and Welfare Plan and Trust v. McKesson Corporation, et al.*, No. 1:18-op-45700-DAP (the "Local 1529 lawsuit").

16.     Cardinal Health will rely on the pleadings in these lawsuits for purposes of establishing its claims, but for convenience of reference, these lawsuits are divided below into four general categories:  (1) Exemplar Governmental Entity Lawsuits; (2) Exemplar Native American Tribe Lawsuit; (3) Exemplar Individual Lawsuit; and (4) Exemplar Third Party Payor/Provider Lawsuits.

17.     Cardinal Health will rely on the full text of the policies and relevant pleadings in the Exemplar Lawsuits for purposes of this action, but recites below some allegations in the Exemplar Lawsuits to demonstrate its entitlement to the requested relief.

a.     ***The Exemplar Governmental Entity Lawsuits***

18.     Many of the Opioid Claims are claims by states, cities, counties, towns, and other governmental units asserting that Cardinal Health and others are responsible for amounts incurred by the plaintiffs due to bodily injury incurred by their respective residents.  Collectively, all such cases are called the "Governmental Entity Lawsuits."  Many of the Governmental Entity Lawsuits have been consolidated for pre-trial purposes in the MDL.

19.     Exemplars in this category are the Cuyahoga County lawsuit, the Summit County lawsuit, the Ohio AG lawsuit, the New York AG lawsuit, the Suffolk County lawsuit, the Nassau County lawsuit, the Baltimore City lawsuit, the City of Huntington lawsuit, and the Cabell County lawsuit (collectively, the "Exemplar Governmental Entity Lawsuits").

*The Cuyahoga County Lawsuit*

20.     The original and amended complaints filed by Cuyahoga County against Cardinal Health and others, and currently pending in the MDL, are replete with allegations that Cardinal

7

Health and the other defendants have caused bodily injury in Ohio and Cuyahoga county. *E.g.*, Exhibit 1, Third Amended Complaint at ¶¶ 659-710. And Cuyahoga County expressly alleged that Cardinal Health and the other defendants are directly responsible for monetary damages resulting from that bodily injury. *Id.* at ¶¶ 31-32 ("The distribution and diversion of opioids into Ohio and into Cuyahoga County and surrounding areas (collectively, 'Plaintiff's Community'), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief. Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief. These damages have been suffered, and continue to be suffered directly, by the Plaintiff.").

21.     Cuyahoga County alleged that Cardinal Health's (and others') wrongful conduct caused injuries to Cuyahoga County including "[c]osts for providing healthcare and medical care . . . and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths," *id.* at ¶ 946(b), repeatedly referencing statistics on opioid prescriptions and overdoses since 1999, *id.* at ¶¶ 479, 483-84, 663, and statistics on opioid deaths since 2000, *id.* at ¶ 671. Cuyahoga County alleged that Cardinal Health's (and others') wrongful conduct resulted in a "dramatic increase in opioid abuse, addiction, overdose, and death." *Id.* at ¶ 661; *see also id.* at ¶ 14 ("Defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses . . . thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market."). Cuyahoga County alleged that the defendants' wrongful conduct began in the late 1990s. *Id.* at ¶ 873 (alleging that the RICO Marketing Defendants engaged in wrongful conduct "[f]rom approximately the late 1990s to the present"); *id.* at ¶ 4 (alleging that "the push to expand prescription opioid use began in the late 1990s").

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Oct 05 3:24 PM-20CV006581

*The Summit County Lawsuit*

22.    The claims in the Summit County lawsuit are similar to those asserted in the Cuyahoga County lawsuit.  Like Cuyahoga County, Summit County relied on statistics concerning opioid overdoses and deaths since 1999, Exhibit 2, Third Amended Complaint at ¶¶ 4-5, asserting that the allegedly wrongful conduct of Cardinal Health and others caused it to suffer injuries including "[c]osts for providing healthcare and medical care . . . and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths," *id.* at ¶ 903(b).  Summit County based its claim on the alleged "push to expand prescription opioid use [that] began in the late 1990s."  *Id.* at ¶ 4.  That "push," according to the Summit County Complaint, was a joint effort of all the defendants, including Cardinal Health. *See id.* at ¶¶ 543, 762.

*The Ohio AG Lawsuit*

23.    The complaint filed by the Ohio Attorney General is pending in Madison County, Ohio.  Ohio alleges that the opioid epidemic started in the mid-1990s:

> The use of opioids has grown exponentially nationwide over the past two decades. Sales of these prescription drugs have quadrupled since 1999 and they are now the most prescribed drugs in the country.  Overdose deaths from prescription opioids were five times higher in 2016 than 1999, and 40% of all U.S. opioid overdose deaths now involve a prescription opioid.
>
> . . . .
>
> Since 2011, the death toll due to opioid use has only continued to rise.  In 2015, 22,598 people died from an opioid-related overdose. In 2016, that number increased again to 32,445.  Since 1999, the number of opioid overdoses in the country has increased five-fold.
>
> Ohio has been especially hard hit, with 2,875 prescription drug overdose deaths in 2016, a staggering 60% increase over 2015.

Exhibit 3, Complaint at ¶¶ 23, 25-26 (footnotes omitted). Ohio alleges that Cardinal Health and the other defendants "contributed to" the opioid epidemic by "distribut[ing] excessive amounts of prescription opioids." *Id.* at ¶ 122.

24.     While Ohio disclaims a right to recover "for" the bodily injury of its citizens, it expressly seeks to recover its own monetary damages due to the bodily injury to its citizens for which Cardinal Health and the other defendants allegedly are responsible. *Id.* at ¶ 137. For example, the State alleges:

> As a direct and proximate result of the nuisance, the State has sustained significant economic harm by spending substantial sums trying to fix the societal harms caused by Defendants' nuisance-causing activity, including costs to the State's healthcare, criminal, justice, social services, and education systems. The State has also incurred costs relating to lost productivity and lower tax revenue.

*Id.* at ¶ 135.

*The New York AG Lawsuit*

25.     The New York AG lawsuit is pending in Suffolk County, New York and makes allegations that are similar to those made in the Ohio AG lawsuit, seeking payment of amounts spent by the State of New York:

> However, prospective remedies alone will not suffice to work justice here. The State and its residents have already suffered a staggering toll as a result of the Defendants' misconduct: thousands of lives lost, thousands more families destroyed, and communities broken in every part of the State.
>
> From some of these injuries certain measures of economic loss can be distilled, including, for example: sums spent by the State on fraudulently-induced reimbursements of improper opioid prescriptions; lost productivity among state workers impacted by the opioid crisis; and increased public health and public safety expenditures.

Exhibit 4, First Amended Complaint at ¶¶ 23-24.

26.     New York alleges wrongful conduct resulting in bodily injury from at least 1996

onward.  For example, New York asserts that the beginning of the conduct resulting in bodily

injury was 1996:

> The taproot of the opioid epidemic is easy to identify:  OxyContin.
> In 1996, Purdue launched its "revolutionary" new opioid drug with
> a nationwide marketing campaign that relied on deception and
> insider payoffs to overcome a long-established medical
> understanding that opioids posed a high risk of addiction and
> abuse, and should only be prescribed for short-term acute pain,
> cancer, or end-of-life care. Purdue's competitors quickly followed
> suit.

*Id.* at ¶ 5.

27.     New York further alleges that Cardinal Health was involved in wrongful conduct

(and associated bodily injury) that formed a "first wave" of the opioid epidemic, in which

addicted patients received access to massive amounts of opioids:

> From 2000 through 2011, the number of prescriptions for the
> Manufacturer Defendants' opioid drugs more than quadrupled
> nationwide, even though there was no scientific basis for any
> significant increase in opioid treatment as medically necessary or
> appropriate. This scheme was particularly effective in New York,
> where opioid prescriptions rose *ninefold* during the same time
> period.
>
> . . . .
>
> This first wave of the opioid epidemic could not have crested so
> high, however, without the fraud, willful misconduct, and/or gross
> negligence of the pharmaceutical distributors named as defendants
> in this action (the "Distributor Defendants"), who buy controlled
> substances in bulk from the Manufacturer Defendants and then sell
> them to individual pharmacies and other licensed dispensers.
>
> . . . .
>
> While the Manufacturer Defendants may have invented and
> perpetuated the fraudulent messaging aimed at doctors and
> patients, the Distributor Defendants were the ones that jammed
> open the floodgates, saturating the State's pharmacies with the
> Manufacturer Defendants' opioids. This saturation enabled the

"pill mill" prescribers who had been stoked by the fraudulent marketing campaign to have massive prescriptions for their addicted patients filled by the Distributor Defendants' pharmacy customers without drawing any meaningful scrutiny.

*Id.* at ¶¶ 8-9, 11.

*The Suffolk County and Nassau County, New York, Lawsuits*

28.     Multiple counties in New York, including Suffolk and Nassau counties, have adopted a Master Long Form Complaint filed in Suffolk County, New York, as part of the consolidated opioid litigation there (the "New York Consolidated Complaint"). Exhibit 6, Amended Short Form Complaint, at 1; Exhibit 7, Amended Short Form Complaint, at 1. The New York Consolidated Complaint alleges that the counties have incurred monetary damages due to bodily injury suffered by residents of those counties. For example, it alleges:

> Plaintiffs spend millions of dollars each year to provide and pay for health care, services, pharmaceutical care and other necessary services and programs on behalf of residents of their counties whom are indigent or otherwise eligible for services, including payments through services such as Medicaid for prescription opium painkillers ("opioids") which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants.

> Plaintiffs also provide a wide range of other services to its residents, including law enforcement, services for families and children, and public assistance.

> In recent years, Plaintiffs have been forced to expend exorbitant amounts of money, described further below, due to what is commonly referred to as the "opioid epidemic" and as a direct result of the actions of Defendants.

> Plaintiffs are also responsible for either partially or fully funding a medical insurance plan for their employees, including the costs of prescription drugs, including opioids.

> Addiction is a spectrum of substance use disorders that range from misuse and abuse of drugs to addiction. Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder spectrum.

Exhibit 5, Master Complaint at ¶¶ 2-6 (footnote omitted).

29.     The New York Consolidated Complaint alleges that the wrongful conduct and resulting bodily injury began in the "late 1990s." It alleges:

> Defendants, through a sophisticated and highly deceptive and unfair marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids. Chronic opioid therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

*Id.* at ¶ 14. According to New York, "Defendants' efforts were wildly successful in expanding opioid abuse." *Id.* at ¶ 19 (citing statistics on opioid prescriptions since 2000).

30.     The New York Consolidated Complaint also cites statistics on alleged opioid overuse and resulting health care admissions for "opioid analgesic abuse" from 1996 through 2006:

> Between 1996 and 2006, the New York State consumption of hydrocodone increased from approximately 2,000 milligrams (mgs) per person to 12,000 mgs per person. Oxycodone consumption increased from approximately 1,000 mgs per person to 16,000 mgs per person. At the same time, health care admissions for opioid analgesic abuse have risen both nationally and in New York State at rates of greater than 300%.

*Id.* at ¶ 24; *see also id.* at ¶ 40 (footnote omitted) ("Defendants' marketing campaign has been extremely harmful and has cost American lives – including lives of Plaintiffs' residents. Deaths from prescription opioids have quadrupled since 1999. From 2000 to 2014 nearly 500,000 people died from such overdoses; seventy-eight Americans die everyday [sic] from opioid overdoses.").

31.     Both Suffolk and Nassau Counties allege that they have suffered harm for which Cardinal Health is liable based on the allegations in their own complaints and the New York

Consolidated Complaint. *See* Exhibit 6, Amended Short Form Complaint; Exhibit 7, Amended

Short Form Complaint.

*The Baltimore City Lawsuit*

32.     Baltimore City alleges that the beginning of the opioid epidemic was in the "mid

to late 1990s", alleging that this period marked the change of prescribing patterns for long-term

use of opioids to treat chronic pain.  Exhibit 8, Second Amended Complaint at ¶ 4.

33.     Baltimore City cites data beginning in 1999 alleging that wrongful conduct by the

"Manufacturing Defendants" (but for which Cardinal Health, as a "Distributor Defendant,"

allegedly also is liable, *see, e.g.*, *id.* at ¶ 420) correlates directly with "skyrocketing rates of

opioid use disorders, overdose, and death." *Id.* at ¶ 10; *see also id.* at ¶ 11 ("Between 1999 and

2010, overdose deaths involving prescription opioids nearly quadrupled. More than 183,000

people died in the United States from overdoses related to prescription opioids between 1999 and

2015.  Surging sales of prescription opioids also spawned booming secondary markets for

illegally diverted prescription pills and heroin—the drug of choice for many individuals with an

opioid use disorder who can no longer afford or access prescription drugs.").

34.     Baltimore City alleges not only that the city was required to spend money on city

services, but also that it paid or reimbursed for medications that were unnecessary:

> The city of Baltimore maintains a $12.2 million public health
> budget, a significant portion of which is devoted to treating opioid
> abuse.  For example, the City spends approximately $1.6 million
> annually on treating substance use disorders; has trained nearly
> 30,000 people how to administer the opioid overdose antidote
> naloxone; . . . .
>
> The City of Baltimore suffered both injuries and pecuniary losses
> proximately caused by the Defendants' breaches. Among other
> things, Baltimore has experienced an unprecedented opioid
> addiction and overdose epidemic costing millions in health
> insurance, treatment services, emergency visits, treatment for

related illnesses and accidents, payments for fraudulent
prescriptions, and lost productivity to Baltimore's workforce.

*Id.* at ¶¶ 531, 559.

*The City of Huntington, West Virginia Lawsuit*

35.     The City of Huntington, West Virginia alleges that the bodily injury allegedly

caused by Cardinal Health and the other defendants began no later than 1997.  It alleges:

> In the last 20 years [*i.e.*, since at least January 1997], an opioid
> epidemic has infected this country, particularly in Huntington,
> West Virginia.  Defendants each played a key role in the creation
> and continuation of the opioid epidemic resulting momentous
> damages.

Exhibit 9, Amended Complaint at ¶ 19; *see also, e.g.*, *id.* at ¶ 30 ("As in the rest of the United

States, opioid prescriptions [in West Virginia] started skyrocketing in the mid-1990s as

pharmaceutical companies introduced powerful new painkillers such as MS Contin and

Oxycontin to the public.").

36.     The City of Huntington alleges monetary loss due to bodily injury to its residents:

> The City of Huntington has been severely damaged by Defendants'
> collective actions. The Defendants have illegally and tortiously
> profited from the prescription drug abuse problems knowingly
> dumping opioids into the City of Huntington. The devastation
> caused by these Defendants goes beyond the economic damage;
> the City of Huntington's families have lost children, parents and
> grandparents. This epidemic of opioid abuse caused by the
> Defendants has taken and destroyed the lives of many residents of
> the City of Huntington.

*Id.* at ¶ 2.

*The Cabell County, West Virginia Lawsuit*

37.     Cabell County, West Virginia alleges that Cardinal Health's allegedly wrongful

conduct and the associated bodily injury "began in the late 1990s."  Exhibit 10, Second

Amended Complaint at ¶ 4.  It alleges:

Case: 1:20-op-45781-DAP Doc #: 1-3 Filed: 12/23/20 1 of 26. PageID #: 68

> Since the push to expand prescription opioid use began in the late
> 1990s, the death toll has steadily climbed, with no sign of slowing.
> The number of opioid overdoses in the United States rose from
> 8,000 in 1999 to over 20,000 in 2009, and over 33,000 in 2015. In
> the twelve months that ended in September 2017, opioid overdoses
> claimed 45,000 lives.

*Id.* (footnote omitted).

*The Cabell County and City of Huntington, West Virginia Joint and Amended Complaint*

38.     In September 2019, Cabell County and the City of Huntington, West Virginia

filed a joint third amended complaint that elaborated on the claims already pleaded.  They

continued to assert that the opioid epidemic in their jurisdictions began in the mid- or late-1990s.

*E.g.*, Exhibit 11, Corrected Joint and Third Amended Complaint at ¶¶ 6, 17, 20, 319, 372.

39.     The Corrected Joint and Third Amended Complaint alleges wrongful conduct by

Cardinal Health beginning in 1996.  It alleges:

> From 1996 to 2008, Cardinal Health did not have an anti-diversion
> program that could adequately monitor and detect suspicious
> orders of opioids or timely report any suspicious orders.
>
> . . . .
>
> From at least 1996 to 2008 Cardinal's other method for reporting
> suspicious orders was through the submission of Ingredient Limit
> Reports (ILR) to the DEA. These were retrospective monthly
> summaries for the prior month related to all controlled substances
> including opioids. These reports showed which orders of
> controlled substances Cardinal received that exceeded a pre-
> determined average that had been multiplied by 4. Cardinal's
> submission of ILRs did not satisfy its obligation to report
> suspicious orders under 21 C.F.R. 1301.74(b) as they were only
> submitted after the orders had already shipped. Cardinal knew the
> reports did not satisfy Cardinal's suspicious order reporting
> obligations because both the DEA and the National Wholesale
> Druggists Association – predecessor of the Healthcare Distribution
> Alliance – had made it clear as early as 1984 that they did not.

*Id.* at ¶¶ 829, 835.

As a direct and proximate result of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid epidemic that has caused enormous harm and injury to the Plaintiffs and Plaintiffs' Community.

*Id.* at ¶ 1550.

Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

*Id.* at ¶ 1573.

 *b.* ***The Exemplar Native American Tribe Lawsuit***

*The Cherokee Nation Lawsuit*

40. The Cherokee Nation makes a variety of claims against Cardinal Health and other defendants, asserting that it has been damaged due to bodily injury and property damage:

The nuisance has affected Cherokee Nation in that it has undermined, is undermining, and will continue to undermine Cherokee Nation citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage within Cherokee Nation. It has resulted in high rates of addiction, overdoses, and dysfunction within Cherokee Nation.

As a direct and proximate result of the nuisance, Cherokee Nation has sustained economic harm by spending substantial sums trying to fix the societal harms caused by Defendants' nuisance-causing activity, including costs to the healthcare, criminal justice, social services, welfare, and education systems.

Exhibit 12, First Amended Complaint at ¶¶ 326, 332. The Cherokee Nation First Amended Complaint also alleges claims based on the expenses due to children born to addicted mothers. It alleges:

Sadly, even Cherokee Nation's youngest citizens bear the consequences of the opioid abuse epidemic. Many Cherokee infants are born addicted to prescription opioids and suffer from opioid withdrawal and Neonatal Abstinence Syndrome. The impact of Neonatal Abstinence Syndrome can be life-long. Most Neonatal Abstinence Syndrome babies are immediately transferred to a

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Oct 07 3:24 PM-20CV006581

> neonatal intensive care unit for a period of days, weeks or even
> months, depending on the severity of the symptoms and
> complications related to the prenatal exposure to opioids. This can
> require an emergency helicopter evacuation from Cherokee Nation
> hospital to Tulsa for extraordinary emergency care to save the life
> of the newborn child. In many cases, disabilities follow these
> children through elementary school and beyond.

*Id.* at ¶ 43.

41.     The Cherokee Nation First Amended Complaint references statistics regarding opioid abuse "in the 2000s." *Id.* at ¶ 40. It asserts that, in the 14 Cherokee Nation Counties, there were about 3,300 "drug poisoning deaths between 2003 and 2017"—referencing only the dates of death, and leaving open what obviously is an earlier date of opioid abuse. *Id.* at ¶ 35. The First Amended Complaint continues, alleging that for each opioid-related death, the Cherokee Nation experienced "numerous hospital admissions and emergency room visits related to opioids, as well as instances of dependence and non-medical use of opioids." *Id.* at ¶ 36.

### c.     *Injured Individuals' Lawsuits*

42.     A significant group of lawsuits consists of those brought by or on behalf of individuals for bodily injury alleged to have been caused by Cardinal Health and other defendants (the "Injured Individuals' Lawsuits"). The exemplar lawsuit within this category is the *Rees v. McKesson* lawsuit.

*Rees v. McKesson*

43.     In *Rees v. McKesson*, originally filed in the Southern District of Illinois and currently pending in the MDL, plaintiffs bring claims on behalf of infants born with neonatal abstinence syndrome ("NAS"). *Rees* is a putative class action allegedly brought on behalf of "[a]ll persons under the age of eighteen who were diagnosed with neonatal abstinence syndrome (NAS) and whose birth mother (1) used opioids during gestation and (2) had a medical prescription for opioids before or during the gestation period." Exhibit 13, Complaint at ¶ 155.

Because the Complaint was filed on February 28, 2018, the class period includes persons born on

or after February 28, 2000, and plaintiffs also expressly allege bodily injury during the preceding

nine-month period of gestation. The Complaint seeks, among other things, "compensatory

damages, statutory damages, and any other relief allowed by law against the Defendant opioid

drug distributors, retailers, and manufacturers." *Id.* at ¶ 15.

   ***d.***   ***The Exemplar Third-Party Payor/Provider Lawsuits***

  44.   Another significant group of lawsuits is comprised of claims by hospitals, unions,

health care providers, or other health care payors (and others) seeking to recover amounts

incurred due to services provided, or amounts incurred or paid due to the bodily injury of

patients or others. Collectively, all such cases are called the "Third Party Payor/Provider

Lawsuits." The exemplars in this category are the Tucson Medical Center lawsuit, the West

Boca lawsuit, the Baptist Hospital lawsuit, the Drew Memorial Hospital lawsuit, the Cleveland

Bakers and Teamsters lawsuit, and the Local 1529 lawsuit.

   *The Tucson Medical Center Lawsuit*

  45.   In the Tucson Medical Center lawsuit, filed in the Superior Court of Arizona in

the County of Pima, the plaintiff alleges monetary damages due to bodily injury. For example,

the plaintiff alleges:

> Plaintiff has treated, and continues to treat, numerous patients for
> opioid-related conditions, including: (1) opioid overdose;
> (2) opioid addiction; (3) Hepatitis C, HIV and other infections
> occurring as a result of I.V. drug use; (4) neonatal treatment in its
> NICU for babies born opioid-dependent, for which treatment is
> specialized, intensive, complex, and lengthy; and (5) psychiatric
> and related treatment for patients with opioid addiction who
> present in need of mental health treatment programs.
>
> Tucson Medical Center has incurred and continues to incur
> substantial unreimbursed costs for its treatment of patients with
> opioid-related conditions. These patients with opioid-related
> conditions seek treatment from Tucson Medical Center as a

proximate result of the opioid epidemic created and engineered by Defendants. As a result, Tucson Medical Center's monetary losses with respect to treatment of these patients are foreseeable to Defendants and are the proximate result of Defendants' acts and omissions specified herein.

Tucson Medical Center also has incurred and continues to incur operational costs in the form of surgical procedures and other care that have been and are more complex and expensive than would otherwise be the case if the patients were not opioid affected. Surgical procedures on opioid affected patients have been and are complicated and costly and require special protective measures and related prescription drugs.

Additionally, individuals with opioid addiction have presented and continue to present themselves to Tucson Medical Center claiming to have illnesses and medical problems in an effort to obtain opioids. Tucson Medical Center has incurred and continues to incur operational costs related to the time and expenses in diagnosing, testing, and otherwise attempting to treat these individuals.

Exhibit 14, Complaint at ¶¶ 61-64. The plaintiff seeks, among other things, "compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages." *Id.* at Prayer for Relief, ¶ B.

46. Tucson Medical Center alleges opioid drug overdose deaths beginning no later than 1999:

The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999–2014. Among the 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.

The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.

*Id.* at ¶¶ 187-188.

47. Tucson Medical Center alleges that Cardinal Health, among others, is responsible for doctors' and others' breaches of the standard of care beginning in the 1990s:

Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. . . . .

Each Marketing Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. . . . .

. . . .

The Marketing Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

. . . .

The Marketing Defendants created a vastly and dangerously larger market for opioids. All of the Defendants compounded this harm by facilitating the supply of far more opioids that [sic] could have been justified to serve that market. The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.

. . . .

Defendants' unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief.

. . . .

Each Defendant breached its aforesaid duties by its conduct previously specified herein.

As a proximate result, Defendants have caused Plaintiff's injury related to the treatment of opioid-related conditions. Plaintiff has incurred massive costs by providing uncompensated care as a result of opioid-related conditions.

. . . .

As a direct and proximate result of Defendants' negligence, Plaintiff suffered and will continue to suffer damages including costs related to uncompensated care and other costs related to the distribution of opioids which never should have been sold.

. . . .

Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids to the patients of Plaintiff, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

. . . .

As a direct and proximate result of the nuisance, Plaintiff has sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendants' nuisance-causing activity, including, but not limited to, costs of hospital services and healthcare. In short, the Defendants created a mess, leaving it [sic] to the Plaintiff and other hospitals the costs of cleaning it up. This is a classic nuisance.

*Id.* at ¶¶ 194, 195, 198, 536, 713, 862, 863, 910, 915, 916, 925.

*The West Boca Hospital Lawsuit*

48.     The West Boca Hospital lawsuit was originally filed in the Southern District of Florida and is now pending in the MDL.  West Boca Hospital alleges that it "has incurred and continues to incur substantial unreimbursed charges for its treatment of patients with opioid conditions" and that it "suffered a special injury" by "provid[ing] uncompensated care for patients suffering from opioid related conditions."  Exhibit 15, Complaint at ¶¶ 55, 1002.

49.     West Boca Hospital alleges that the opioid epidemic began in or around 1999. *See, e.g.*, *id.* at ¶¶ 4 (citing data on prescription opioid sales beginning in 1999); 7 (citing drug

overdose data beginning in 1999); 20 (citing data on adult hospitalizations due to opioid misuse

or dependence from 2000 to 2012); 36 (alleging that "[b]y 2002, the human toll . . . had become

'increasingly alarming,'" and that nearly 400 people died from prescription drug overdoses that

year in the Miami, Fort Lauderdale, and Palm Beach area).

50.     West Boca Hospital alleges that the defendants engaged in a continuing course of

conduct in which each is responsible in some way for the conduct of others.  *See, e.g., id.* at

¶¶ 16, 17, 29.  In particular, it alleges that "[t]his Complaint alleges a continuing course of

conduct (including conduct within the limitations periods), and Defendants' unlawful conduct

has inflicted continuing and accumulating harm within the applicable statutes of limitations." *Id.*

at ¶ 157.

*The Baptist Hospital Lawsuit*

51.     A third Exemplar Third-Party Payor lawsuit is the Baptist Hospital lawsuit, which

was filed in the Northern District of Florida and is currently pending in the MDL.  Baptist

Hospital alleges:

> Defendants thus intentionally and negligently created conditions in
> which vast amounts of opioids have flowed freely from drug
> manufacturers to innocent patients who became addicted, to opioid
> abusers, and even to illicit drug dealers - with distributors regularly
> fulfilling suspicious orders from pharmacies and clinics, who were
> economically incentivized to ignore "red flags" at the point of sale
> and before dispensing the pills.
>
> . . . .
>
> For years Defendants and their agents have had the ability to
> substantially reduce the death toll and adverse economic
> consequences of opioid diversion, including the deaths and health
> ruination of hundreds of thousands of citizens. Substantial
> expenditures by HOSPITALS in dealing with the problem have
> gone un-recouped and unreimbursed. All the Defendants in this
> action share responsibility for perpetuating the epidemic.

> Defendants have foreseeably caused damages to HOSPITALS including the unreimbursed and/or un-recouped costs of providing: (a) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (b) counseling and rehabilitation services; (c) security and public safety; (d) added regulatory compliance; (e) lost opportunity costs; (f) the diversion of assets from the provision of other needed health care; and (g) increased human resources costs as well as lost productivity of its employees.

Exhibit 16, Complaint at ¶¶ 5, 7, 8.

52.     Baptist Hospital alleges prescription opioid use and abuse statistics beginning no later than 1999, and asserts that Cardinal Health and other "Distributor Defendants" bear liability for resulting damages.  *See, e.g.*, *id.* at ¶¶ 94-106, 110.

*The Drew Memorial Hospital Lawsuit*

53.     Drew Memorial Hospital alleges claims based on unreimbursed costs of providing care to persons addicted to opioids or otherwise injured due to opioids.  It alleges:

> As a direct and proximate result of such grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff asserts a claim for judgment for all compensatory and punitive damages against the Defendants including, but not limited to, uncompensated care and treatment of those who became addicted to Defendants' drugs and those individuals injured in the drug trade in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiff is entitled by law.

Exhibit 17, Amended Complaint at ¶ 170.

54.     Drew Memorial Hospital asserts that a prescription opioid misuse and abuse epidemic began no later than 1999.  *See, e.g.*, *id.* at ¶ 133.  The Complaint also alleges that, "by the late 1990s, and continuing today, each Defendant began a marketing scheme designed to persuade doctors and patients that opioids can be used effectively for treatment of chronic pain, a

24

far broader group of patients much more likely to become addicted and suffer other adverse effects from long-term use of opioids." *Id.* at ¶ 4.

*The Cleveland Bakers and Teamsters Lawsuit*

55.     The Cleveland Bakers and Teamsters lawsuit asserts claims based on allegedly excessive payments to pay or reimburse for opioids prescribed to its members, along with other costs allegedly incurred as a result of the defendants' actions.  *See* Exhibit 18, Amended Complaint at ¶ 974.  In particular, the plaintiffs allege that they have been injured because:

> (a)     payments for hospital and/or urgent care emergency department visits and other treatment for opioid misuse, addiction, and/or overdose have increased;
>
> (b)     payments for emergency department visits for infections related to opioid misuse, addiction, and/or overdose have increased;
>
> (c)     payments for hospitalizations related to the misuse, addiction and/or overdose of opioids have increased;
>
> (d)     payments for medicines to treat HIV, hepatitis C and other issues related to the [sic] opioid misuse, addiction and/or overdose have increased; and
>
> (e)     payments for opioid overdose reversal medication such as Naloxone Hydrochloride (Narcan) have increased.

*Id.*

56.     The Amended Complaint in the Cleveland Bakers lawsuit alleges that wrongful conduct began in "approximately the late 1990s," *id.* at ¶ 854, citing studies and statistics regarding prescription opioid promotion, alleged misinformation, sales, abuse, and injury from the 1990s onward, *see, e.g., id.* at ¶¶ 4, 5, 12, 16.  The Complaint charges Cardinal Health with knowledge of and responsibility for the alleged wrongful conduct.  *See, e.g., id.* at ¶¶ 494, 511.

*The Local 1529 Lawsuit*

57. The Local 1529 lawsuit was brought by the United Food and Commercial Workers Union UFCW Local 1529 and Employers Health and Welfare Plan and Trust, and is pending in the Northern District of Ohio. It alleges:

> The Plaintiff UFCW LOCAL 1529 is a Taft-Hartley health and welfare benefit fund, and governed in part by federal law and regulations. At all relevant times, Plaintiff has paid and/or provided reimbursement for some or the entire purchase price on behalf of its participants for prescription opioids which are manufactured, marketed, promoted, sold, and/or distributed by the Defendants. Plaintiff has sustained injury as a result of Defendants' illegal and wrongful conduct alleged herein, including but not limited to, incurring unreimbursed costs related to the over-prescription of opioids.

Exhibit 19, Complaint at ¶ 10.

58. The Local 1529 lawsuit identifies the late 1990s as the starting point for the alleged injury-causing conduct. *See, e.g.*, *id.* at ¶ 95 (citing report stating that opioid prescriptions have quadrupled since 1999 and have increased in parallel with overdoses). The Complaint then alleges:

> Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States. Overdose deaths involving prescription opioids are at epidemic proportions, quadrupling since 1999, concomitant with sales of these prescriptions.

*Id.* at ¶ 104.

59. The Complaint alleges that Cardinal Health is responsible for the asserted wrongful conduct and the consequences alleged. *See, e.g.*, *id.* at ¶¶ 121, 132, 134, 141, 143, 155-183, 204-209.

26

## NATIONAL UNION'S RESPONSE TO THE OPIOID CLAIMS

60.　　Cardinal Health first gave notice to National Union of the Opioid Claims on June 18, 2018.  Since then, Cardinal Health has given National Union timely notice of the Opioid Claims, including each of the Exemplar Lawsuits, on a rolling basis.

61.　　National Union is an umbrella insurer for the years 1999 through 2004.  National Union issued its first reservation of rights letter relating to the Opioid Claims on January 30, 2019.  Since then, National Union has continued to reserve the right to deny coverage for the Exemplar Lawsuits.  To date, National Union has failed to acknowledge coverage for any of the Opioid Claims or to perform any duty or obligation under any of the National Union Policies (as defined in paragraph 66), and Cardinal Health has reserved the right to claim that National Union has actually or effectively denied that any coverage exists.

62.　　On information and belief, Cardinal Health understands that National Union contends, incorrectly, that Cardinal Health must satisfy the underlying retention of all of the National Union Policies and exhaust any other "underlying policies" in other policy years before Cardinal Health is entitled to a defense under any of the National Union Policies.

63.　　In 2019, Cardinal Health provided National Union with Cardinal Health's only copies of the National Union Policies (which were the broker's copies).

64.　　On August 13, 2019, National Union produced what are claimed to be "Archive Copies" of its policies, which copies appear to be incomplete or inaccurate.  National Union does not possess, or has not provided, accurate copies of the policies that National Union issued to Cardinal Health.

65.　　Despite subsequent attempts to confirm the accuracy of National Union's copies, questions remain regarding the accuracy or authenticity of the policies provided to date by National Union.

## THE NATIONAL UNION POLICIES

66.     As relevant to this Action, Cardinal Health purchased from National Union certain general liability umbrella insurance policies with effective dates and policy numbers as set forth below (each, a "National Union Policy" and, collectively, the "National Union Policies"):

| Policy No. | Effective Dates | Occurrence Limit |
|------------|-----------------|------------------|
| BE 7016236 | 6/30/99 to 6/30/00 | $50,000,000 |
| BE 7016236 | 6/30/00 to 6/30/01 | $50,000,000 |
| BE 7016236 | 6/30/01 to 6/30/02 | $50,000,000 |
| BE 2131276 | 6/30/02 to 6/30/03 | $50,000,000 |
| BE 2860251 | 6/30/03 to 6/30/04 | $50,000,000 |

67.     Due to the volume of these policies, each National Union Policy has not been attached to this Complaint.   The evidence of National Union Policies is in the possession of National Union, but for the avoidance of doubt additional copies will be provided to National Union.

68.     The National Union Policies attach and provide coverage subject to their terms after Cardinal Health satisfies a self-insured retention.

69.     The National Union Policies include a duty to defend or an obligation to pay defense costs.

70.     Subject to Cardinal Health's reservation regarding any disputed terms of the National Union Policies, and upon information and belief, evidence regarding the National Union Policy numbered BE 7016236, for the policy period June 30, 2000 to June 30, 2001 (the

"National Union 2000-2001 Policy") is attached as Exhibit A and B to this Complaint.[2]  As

described above, some questions remain regarding the National Union 2000-2001 Policy, and

Cardinal Health reserves the right to supplement or substitute the policy documentation

following production of authentic and certified copies.  All allegations regarding the National

Union 2000-2001 Policy are subject to this reservation.

71.     On information and belief, the National Union 2000-2001 Policy provides as

follows with respect to its coverage grant:

> **Coverage**
>
> We will pay on behalf of the **Insured** those sums in excess of the
> Retained Limit that the **Insured** becomes legally obligated to pay
> by reason of liability imposed by law or assumed by the **Insured**
> under an **Insured Contract** because of **Bodily Injury**, **Property
> Damage**, **Personal Injury** or **Advertising Injury** that takes place
> during the Policy Period and is caused by an **Occurrence**
> happening anywhere in the world.

Exhibit A at p. 85.

72.     Subject to Cardinal Health's reservation, and on information and belief, the

National Union 2000-2001 Policy provides as follows with respect to its defense obligation:

> **Defense**
>
> A.      We shall have the right and duty to defend any claim or
> **suit** seeking damages covered by the terms and conditions of this
> policy when:
>
> 1.      The applicable Limits of Insurance of the underlying
> policies listed in the Schedule of Underlying Insurance and the
> Limits of Insurance of any other underlying insurance providing
> coverage to the **Insured** have been exhausted by payment of
> claims to which this policy applies; or
>
> 2.      Damages are sought for **Bodily Injury**, **Property Damage**,
> **Personal Injury** or **Advertising Injury** covered by this policy but

---

[2] Exhibit A is the broker copy of the policy provided by Cardinal Health to National Union.  Exhibit B is the copy of the policy provided by National Union to Cardinal Health.

not covered by any underlying insurance listed in the Schedule of
Underlying Insurance or any other underlying insurance providing
coverage to the **Insured**.

*Id.*

73.     On information and belief, as stated in the "Schedule of Underlying Insurance" in

the National Union 2000-2001 Policy, there is no underlying insurance that provides coverage on

a "products/completed operations" basis.

74.     On information and belief, National Union's duty to defend under the National

Union 2000-2001 Policy attaches, for purposes of defense costs, once Cardinal Health pays not

more than $1 million in defense costs or expenses toward an occurrence.

75.     National Union's obligation to defend or pay defense costs under the National

Union 2000-2001 Policy continues until the per-occurrence or aggregate limits of the National

Union 2000-2001 Policy is exhausted by payment of indemnity.  The costs incurred by National

Union to defend or pay defense costs do not erode the indemnity limits of the Policies.

## NATIONAL UNION'S COVERAGE POSITION

76.     National Union has stated that it reserves the right to deny coverage for the

Exemplar Lawsuits but in words, meaning, and effect, National Union actually denies coverage

and has failed to acknowledge, and/or has denied, and/or has failed to perform, any duty to

defend under any of the National Union Policies.

77.     As to all of the Exemplar Lawsuits, National Union has actually or in effect

denied and/or failed to acknowledge coverage on the basis that National Union contends that the

claims in the Exemplar Lawsuits do not involve an "occurrence," or are otherwise not within

coverage, or are excluded from coverage.

78.     On information and belief, National Union's position is that Cardinal Health must satisfy the underlying retention amount of all of the National Union policies before Cardinal Health is entitled to attach or make a claim against any of the National Union Policies.

79.     A declaration of the parties' rights and obligations will resolve disputed issues regarding the operation of the National Union Policies as applicable to the Exemplar Lawsuits.

## COUNT I

## DECLARATORY JUDGMENT

80.     Cardinal Health incorporates by reference each of the allegations set forth in paragraphs 1 through 79 above as if expressly set forth herein.

81.     The Exemplar Lawsuits and the MDL lawsuits assert claims that potentially are covered under the National Union Policies, including but not limited to the National Union 2000-2001 Policy.

82.     Under Ohio law, when more than one occurrence-based policy is triggered due to the time frame of the underlying events alleged in the claims against the policyholder, the policyholder is entitled to select any triggered policy for purposes of paying for the defense of such claims until such defense obligation is exhausted or circumstances otherwise require (including but not limited to the insurer's failure to appropriately discharge the defense obligation), at which point the policyholder is entitled to select another triggered policy to undertake a defense obligation.

83.     Under Ohio law, an insurer's duty to defend is determined based on the terms of the insurance policy as compared to the allegations in the pleading filed against the policyholder. If a single claim against Cardinal Health is even potentially within the scope of coverage, then the insurer has a duty to defend all claims in that proceeding.

84. Each of the National Union Policies is triggered by at least one of the claims in the Exemplar Lawsuits and, thus, in the MDL.

85. National Union has actually or effectively denied or declined to acknowledge any defense obligation for the Exemplar Lawsuits under the National Union Policies, including but not limited to the National Union 2000-2001 Policy.

86. Cardinal Health seeks a declaration that, subject to attachment, pursuant to the National Union Policies, including but not limited to the National Union 2000-2001 Policy, National Union is obligated to pay for defense costs for the Exemplar Lawsuits according to the meaning and application of the terms of each policy as established in this action.

87. Subject to further information regarding the terms and conditions of the National Union Policies, and subject to any claims or arguments made by National Union or developments in this case or in the Opioid Claims, Cardinal Health intends to select the National Union 2000-2001 Policy (hereinafter, the "Selected National Union Policy") to pay for the defense of the Exemplar Lawsuits and the MDL.

88. Cardinal Health seeks a declaration that, subject to attachment, pursuant to the National Union Policies, including but not limited to the Selected National Union Policy, National Union must defend, or pay for defense costs incurred in, the Exemplar Lawsuits and the MDL.

89. The self-insured retention of the Selected National Union Policy has been exhausted by Cardinal Health's payment of defense costs in the Opioid Claims.

90. An actual controversy exists between the parties with respect to Cardinal Health's rights and National Union's obligation to defend or pay defense costs, and a declaration of the parties' respective rights and obligations will terminate some or all of the parties' controversies.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Oct 07 3:52 PM-20CV006581

# PRAYER FOR RELIEF

**WHEREFORE**, Cardinal Health demands judgment as follows:

a.  A declaration that the Exemplar Lawsuits assert claims that potentially are covered under the National Union Policies, including but not limited to the Selected National Union Policy.

b.  A declaration that Cardinal Health is entitled to select any of the National Union Policies for purposes of a defense of the Exemplar Lawsuits, until such defense obligation is exhausted or circumstances otherwise require (included but not limited to any insurer's failure to appropriately discharge the defense obligation), at which point Cardinal Health is entitled to select any other triggered policy to undertake a defense obligation.

c.  A declaration that each of the National Union Policies is triggered by the claims in the Exemplar Lawsuits and the MDL.

d.  A declaration that the "occurrence" term in the National Union Policies has been satisfied by the Exemplar Lawsuits for purposes of defense costs.

e.  A declaration that the Selected National Union Policy attaches for purposes of defense costs once Cardinal Health pays not more than $1,000,000 in defense costs or expenses toward a potentially covered occurrence.

f.  A declaration that National Union's obligation to pay defense costs does not erode the limits of the policies and continues until the per-occurrence or aggregate limits of its policies are exhausted.

g.  A declaration that National Union has actually or in effect denied any obligation to pay defense costs, undertake a defense duty, or acknowledge

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Oct 07 3:24 PM-20CV006581
0F273 - E11

a defense duty regarding the Exemplar Lawsuits under the National Union policies.

h.   A declaration that Cardinal Health is not required to allocate any defense costs or expenses to multiple policies or policy years.

i.   A declaration that National Union is obligated to pay for the defense costs incurred in the Exemplar Lawsuits pursuant to the Selected National Union Policy as such costs are accrued until such lawsuits are dismissed or otherwise limited to claims that are not potentially within the coverage of the Selected National Union Policy, or until the Selected National Union Policy has paid its full limits by way of indemnity, or until Cardinal Health selects a different policy to provide a defense obligation.

j.   A declaration that all of the defense costs incurred by Cardinal Health in the MDL are reimbursable as defense costs attributable to the Track 1A lawsuits, up to the date such lawsuits were finally resolved by settlement or alternatively, in the event that all such defense costs are not deemed to be attributable to the Track 1A lawsuits, a declaration as to such defense costs that are so attributable.

k.   A declaration that such defense costs that are incurred in the MDL after the date of the final resolution of the Track 1A lawsuits are attributable one or more Exemplar Opioid Claims that are part of the MDL.

l.   A declaration that, after National Union makes payment of its full indemnity limits of the Selected National Union Policy, Cardinal Health is entitled to select any other of the National Union Policies, or any other

excess policy (subject to attachment) to pay for defense costs incurred in
the Exemplar Lawsuits after such date, until the indemnity limits of such
policy are exhausted, after which Cardinal Health may select another
policy to pay ongoing defense costs.

m.   Any other appropriate declaratory relief that appears as of the date of
resolution, taking into account the answers to this complaint, and any
other matters that occur as of the date of judgment.

n.   An award of any other appropriate relief, including but not limited to
costs, fees, and other expenses.

Dated:  October 7, 2020

/s/ Michael R. Gladman

Michael R. Gladman (Ohio Bar # 59797)*
   *Trial Attorney*
Yvette McGee Brown (Ohio Bar # 30642)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio  43215-2673
(614) 469-3939
Email:  mrgladman@jonesday.com

Mark J. Andreini (Ohio Bar # 63815)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
Email:  mjandreini@jonesday.com

Michael H. Ginsberg (PA Bar #43582)
John E. Iole (PA Bar #47768)
(*pro hac vice forthcoming*)
JONES DAY
500 Grant Street – 45th Floor
Pittsburgh, PA  15219
Email:  jeiole@jonesday.com

Counsel for Plaintiff
CARDINAL HEALTH, INC.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Oct 07 3:24 PM-20CV006581

## JURY DEMAND

Plaintiff requests a trial by jury on all issues triable to a jury.

Dated: October 7, 2020

/s/ Michael R. Gladman
Michael R. Gladman (Ohio Bar # 59797)*
   *Trial Attorney*
Yvette McGee Brown (Ohio Bar # 30642)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215-2673
(614) 469-3939
Email: mrgladman@jonesday.com

Counsel for Plaintiff
CARDINAL HEALTH, INC.

## LIST OF EXHIBITS TO PLAINTIFF'S COMPLAINT
## FOR DECLARATORY JUDGMENT

| Exhibit | Description |
|---------|-------------|
| A | National Union - Policy BE 7016236 – Copy provided by Broker |
| B | National Union - Policy BE 7016236 – Copy provided by National Union |
| 1 | *The County of Cuyahoga v. Purdue Pharma, L.P., et al.*, No. 17-OP-45004, Third Amended Complaint |
| 2 | *The County of Summit, et al. v. Purdue Pharma, L.P., et al.*, No. 18-op-45090, Third Amended Complaint |
| 3 | *The State of Ohio ex rel. DeWine v. McKesson Corporation, et al.*, CV H20180055 Complaint |
| 4 | *The People of the State of New York v. Purdue Pharma, L.P., et al.*, No. 400016/2018 First Amended Complaint |
| 5 | *New York Counties v. Purdue Pharma, L.P., et al.*, No. 400000/2017 Master Long Form Complaint |
| 6 | *The County of Suffolk v. Purdue Pharma, L.P., et al.*, No. 400001/2017 Amended Short Form Complaint |
| 7 | *The County of Nassau v. Purdue Pharma, L.P., et al.*, No. 400008/2017 Amended Short Form Complaint |
| 8 | *Mayor & City Council of Baltimore v. Purdue Pharma, L.P., et al.*, No. 24 C 18000515 Second Amended Complaint |
| 9 | *The City of Huntington v. AmerisourceBergen Drug Corp., et al.*, No. 17-C-38 Amended Complaint |
| 10 | *Cabell County Commission v. AmerisourceBergen Drug Corp., et al.*, No. 17-op-45053-DAP Second Amended Complaint |
| 11 | *Cabell County Commission and City of Huntington v. Purdue Pharma, L.P., et al.*, No. 17-md-2804 Corrected Joint and Third Amended Complaint |
| 12 | *The Cherokee Nation v. McKesson Corporation, et al.*, No. 6:18-cv-00056-RAW First Amended Complaint |
| 13 | *Rees v. McKesson Corporation, et al.*, No. 18-511 Class Action Complaint |
| 14 | *Tucson Medical Center v. Purdue Pharma, L.P., et al.*, No. 4:18-cv-00481-RCC Complaint |
| 15 | *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al.*, No. 1:17-MD-2804 Complaint |

| Exhibit | Description |
|---------|-------------|
| 16 | *Baptist Hospital, Inc., et al. v. McKesson Corporation, et al.*, No. 3:17-cv-816 Complaint |
| 17 | *Drew Memorial Hospital, Inc. v. Purdue Pharma, L.P., et al.*, No. CV-2017-221-3 Amended and Substituted Class Action Complaint |
| 18 | *Cleveland Bakers and Teamsters Health and Welfare Fund v. Purdue Pharma, L.P., et al.*, No. 1:18-op-45432-DAP Corrected Unredacted Amended Complaint |
| 19 | *United Food and Commercial Workers Union UFCW Local 1529 and Employers Health and Welfare Plan and Trust v. McKesson Corporation, et al.*, No. 1:18-op-45700-DAP Complaint |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of this Complaint will be served upon Defendant by the Clerk via U.S. Certified Mail to both (1) Defendant's statutory agent at CSC - Lawyers Incorporating Service, 50 W Broad St. Ste. 1800, Columbus, OH 43215, and (2) Defendant's principal place of business at 70 Pine St., New York, NY 10270.

Dated: October 7, 2020

> /s/ Michael R. Gladman
> _____
> Michael R. Gladman (Ohio Bar # 59797)*
>   *Trial Attorney
> Yvette McGee Brown (Ohio Bar # 30642)
> JONES DAY
> 325 John H. McConnell Boulevard
> Suite 600
> Columbus, Ohio 43215-2673
> (614) 469-3939
> Email: mrgladman@jonesday.com
>
> Counsel for Plaintiff
> CARDINAL HEALTH, INC.